UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br>382 HIGHLAND AVENUE,<br>MANCHESTER, VERMONT | Case No. 2:20-MJ-84 |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Eric Brimo, being first duly sworn, hereby depose and state as follows:

**Introduction and Special Agent Background**

1. I make this affidavit in support of an application for a search warrant for a residence located at 382 Highland Avenue, Manchester, Vermont ("Subject Property") as well a search of the persons located therein. The Subject Property has been described as an off-white colored two-story residence on the east side of Highland Avenue, Manchester, Vermont with a red garage in the rear of the residence. The property to be search is further described in Attachment A.

2. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), and have been so employed since February of 2016. Prior to working for the ATF, I was a Special Agent with the U.S. Department of State, Diplomatic Security Service since 2010. I am familiar with federal laws relating to firearms and controlled substances, have been trained in the investigation of violations of said laws, and have participated in such investigations. During my law enforcement career, I have worked on numerous drug and narcotic investigations, and am familiar with criminal use, possession, sale, and trafficking of illegal drugs.

3. My basis of knowledge for this search warrant request comes from conversations with detectives, agents, and law enforcement officers of the ATF, Vermont Drug Task Force

1

("VDTF"), and the Federal Bureau of Investigation ("FBI"). The law enforcement officers I spoke with have advised me they believe the information in this affidavit to be true and accurate. Because this affidavit is submitted for the limited purpose of establishing probable cause for a search warrant, I have not set forth every fact learned by law enforcement during the course of the investigation.

4. Based on the facts outlined in this affidavit, there is probable cause to believe that evidence of crimes as set forth in Attachment B, which have been committed by subjects known as Alexander JOHNSON and Caitlin WILLIAMS, among others known and unknown, namely violations of 21 U.S.C. §§ 841 and 846, will be contained within the Subject Property listed in Attachment A. The items to be seized are listed in Attachment B.

## Probable Cause

5. Based on my conversations with ATF Special Agent (SA) Christopher Bzduch and FBI Task Force Officer (TFO) Jeffrey Stephenson, I learned that during the summer of 2019 the VDTF and FBI began receiving information from a confidential informant (CI)[1] about Alex JOHNSON selling crack cocaine and heroin from his residence at 382 Highland Avenue in Manchester, VT. The CI reported that JOHNSON was being supplied by out-of-state drug traffickers at his residence and JOHNSON's girlfriend, Caitlin WILLIAMS, who lived with JOHNSON, was involved with the drug dealing as well.

---

[1] CI is known to TFO Stephenson and other law enforcement officers. CI's criminal history includes zero felony convictions and 13 misdemeanor convictions. The CI's misdemeanor convictions include Vehicle Operation License Suspended #1 for DUI; Violation of Abuse Prevention Order; Violation of Conditions of Release; False Info-LE Officer/Implicate Another; Reckless Endangerment; Assault-Domestic; Petit Larceny $900 or Less; and Driving While Ability Impaired by the Consumption of Alcohol; . The CI is cooperating with law enforcement for consideration on pending charges.

2

6. From these conversations, I also learned that in June 2020, the VDTF, ATF, and FBI conducted three controlled purchases of fentanyl and crack cocaine involving JOHNSON and WILLIAMS at or very near the Subject Property. A fourth controlled purchase was conducted in June 2020 directly from the Subject Property where an unidentified male within the residence distributed suspected crack cocaine.

### Controlled Purchase #1

7. SA Bzduch advised me that on or about June 11, 2020, a controlled purchase was conducted in the area of the Subject Property, using a VSP CI. The CI spoke with JOHNSON via text messages in regard to purchasing heroin on this date. Prior to the controlled purchase, the CI was outfitted with audio and video surveillance equipment. Law enforcement officers also conducted surveillance of the CI during the controlled purchase. During the controlled purchase, WILLIAMS physically met with the CI on this date in a public place near the Subject Property. WILLIAMS exchanged ten wax paper baggies containing heroin (a bundle) for $100 of VDTF funds provided to the CI. TFO Stephenson was conducting surveillance and identified WILLIAMS during the controlled purchase. The suspected heroin was later field tested and indicated a presumptive positive for the presence of Fentanyl. Det. Trp. Jesse Dambrackas later reviewed the audio and video recordings, which were consistent with the CI conducting a controlled purchase from WILLIAMS.

### Controlled Purchase #2

8. SA Bzduch advised me that on or about June 23, 2020, a controlled purchase was conducted at the subject property, using a VSP CI. The CI spoke with JOHNSON in regard to purchasing crack cocaine on this date. Prior to the controlled purchase, the CI was outfitted with audio and video surveillance equipment. Upon the CI's arrival at the subject property, an

3

unknown black male answered the door and conducted the drug exchange with the CI. During this controlled purchase the CI exchanged $100 of VDTF funds to the unknown male who provided CI with two plastic baggies of suspected crack cocaine. The baggies were later weighed for a total of 0.5 grams with packaging, and one baggie was field tested indicating a presumptive positive for the presence of cocaine and appeared in the crack cocaine form.

## Controlled Purchase #3

9. ATF SA Bzduch advised me that on or about June 23, 2020, he met with ATF Resident Agent in Charge (RAC) Brian Person, FBI TFO Stephenson, and VDTF Det. Tpr. Dambrackas, and other law enforcement personnel at a pre-determined meet location. The purpose of the meet was to attempt to conduct a controlled purchase of narcotics from JOHNSON at the Subject Property.

10. FBI TFO Stephenson and Det. Tpr. Dambrackas informed SA Bzduch that a VSP CI was going to attempt to contact JOHNSON via Facebook Messenger to arrange for a purchase of narcotics, specifically crack cocaine. Investigators advised me that the CI previously knew that JOHNSON utilized a Facebook Messenger account in the name of "Alex Johnson" in order to communicate with customers in order to set up narcotics transactions.

11. Some time passed and FBI TFO Stephenson and Det. Tpr. Dambrackas informed RAC Person and SA Bzduch that the VSP CI made contact with JOHNSON. According to the VSP CI, JOHNSON contacted the CI and informed him/her to come to his (JOHNSON's) residence (the Subject Propery) in ten minutes to purchase crack cocaine.

12. At this time, SA Bzduch obtained $100.00 in U.S. currency from RAC Person to use for the purchase of narcotics from JOHNSON. A photograph was taken of the funds used in the

4

controlled purchase prior to using them. SA Bzduch was also outfitted with electronic transmitting and recording devices to use during the controlled purchase of evidence.

13. At approximately 7:31pm, ATF personnel departed the staging area and travelled to the area of the subject property to take up surveillance positions in the area. At approximately 7:33pm, SA Bzduch, while acting in an undercover capacity, then utilized an ATF special purpose vehicle (SPV) to drive himself and the VSP CI to the Subject Property. SA Bzduch and the VSP CI arrived at the Subject Property at approximately 7:39pm.

14. SA Bzduch pulled the ATF SPV into the driveway of the Subject Property and parked there. The VSP CI and SA Bzduch exited the ATF SPV and walked toward the rear of the residence. SA Bzduch observed an Audi hatchback vehicle bearing Vermont registration HBE718 parked behind the residence.

15. The VSP CI and SA Bzduch walked up to a back door of the residence. SA Bzduch heard a dog barking and then observed an individual whom he advised me he identified as JOHNSON come from the inside of the residence to the back door. SA Bzduch identified JOHNSON based on previously reviewing photographs of JOHNSON, which were provided by ATF SA John McKee. The VSP CI and SA Bzduch engaged JOHNSON in conversation. JOHNSON confirmed that SA Bzduch and the VSP CI wanted $100.00 worth of drugs. JOHNSON handed SA Bzduch two bags containing an off-white substance, which SA Bzduch believed to be crack cocaine. SA Bzduch then handed JOHNSON the $100.00 of pre-recorded ATF agent cashier funds. SA Bzduch advised he observed JOHNSON counting the cash.

16. SA Bzduch advised that JOHNSON stated, "I just cooked that shit up." At the time, JOHNSON was referring to the suspected drugs that SA Bzduch had just purchased. JOHNSON also stated, "I got up, down too and soft…" and "the soft is fire." SA Bzduch advised me that he

5

knew that the words "up" and "soft" are commonly used street terms for cocaine and that the word "down" is a commonly used street term for heroin.

17. The VSP CI and SA Bzduch then terminated the conversation with JOHNSON and walked back towards the driveway where the ATF SPV was parked. The VSP CI and SA Bzduch entered the ATF SPV and departed from the Subject Property at 7:40pm.

18. SA Bzduch advised he and the VSP CI drove in the ATF SPV to a pre-determined meet location. Once there, SA Bzduch advised he and the VSP CI met with RAC Person and other law enforcement personnel. SA Bzduch then secured the purchased evidence inside of the ATF SPV.

19. SA Bzduch then advised he transported the purchased suspected crack cocaine to the ATF Springfield Field Office. Once at the office, SA Bzduch weighed and took photographs of the suspected crack cocaine. The suspected crack cocaine weighed approximately 0.5 grams (weight included packaging material). SA Bzduch advised that he observed the characteristics of the substance purchased to be consistent with that of crack cocaine. Due to safety and health concerns for ATF law enforcement personnel, the suspected crack cocaine was not field-tested.

**Controlled Purchase #4**

20. SA Bzduch advised me that on or about June 25, 2020, ATF and other law enforcement agencies conducted a controlled purchase of suspected crack cocaine from WILLIAMS at the Subject Property.

21. SA Bzduch advised that on that date at approximately 7:15pm, members of the ATF, VSP and Rutland Police Department (RPD) departed the staging area and traveled to the subject property to take up surveillance positions in the area.

22. At approximately 7:17pm, SA Bzduch, while acting in an undercover capacity, utilized an ATF special purpose vehicle ("SPV") to drive himself to the subject property. SA Bzduch advised me he arrived at the Subject Property at approximately 7:21pm.

23. SA Bzduch advised he arrived at the Subject Property and then parked the SPV in the driveway. SA Bzduch exited from the ATF SPV and walked towards the rear of the residence. SA Bzduch observed an Audi hatchback vehicle bearing Vermont registration HBE718 parked behind the residence.

24. SA Bzduch walked up to the back door of the residence, knocked on door, and attempted to make contact with JOHNSON. SA Bzduch advised he heard a voice and observed an unidentified male through the window of the residence.

25. SA Bzduch engaged with the male in a short conversation through the window of the residence and informed the male that SA Bzduch wanted to purchase $100.00 worth of crack cocaine. The unidentified male acknowledged the request and then SA Bzduch advised he observed a white female, whom he recognized as WILLIAMS, exit from the residence and open the rear door where SA Bzduch was standing. SA Bzduch identified WILLIAMS based on previously reviewing a photograph of WILLIAMS, which was provided by ATF SA John McKee.

26. WILLIAMS invited SA Bzduch into the back room of the residence. At this time, SA Bzduch observed a dog exit the residence and enter the back room with SA Bzduch and WILLIAMS. SA Bzduch asked WILLIAMS if JOHNSON was present at the location and WILLIAMS acknowledged that he was. WILLIAMS told SA Bzduch to wait in the back room while she entered the door leading inside the residence.

27. While SA Bzduch was waiting in the back room, he observed through the glass door what appeared to be another unidentified male standing inside of the residence. SA Bzduch advised that the second male appeared to be younger and shorter than first male.

28. WILLIAMS eventually appeared at the door leading into the residence and asked SA Bzduch his name. SA Bzduch advised he responded to WILLIAMS and then overheard WILLIAMS relaying the information provided by SA Bzduch verbally to another individual in a separate room. SA Bzduch advised he was not able to observe to whom WILLIAMS was conversing. SA Bzduch advised he then observed WILLIAMS enter a room, which was located to the left of the interior door leading into the residence.

29. SA Bzduch advised he observed that the interior door where he was standing opened into the kitchen area of the residence. SA Bzduch could observe what appeared to be a living room/sitting room area located off the kitchen to the right of the interior door where SA Bzduch was standing.

30. SA Bzduch advised he then observed WILLIAMS re-appear from the doorway off to the left of the interior door where SA Bzduch was standing. SA Bzduch observed WILLIAMS to have her hands closed as if she was carrying something. WILLIAMS approached SA Bzduch and stated "…here's two fifties…" While WILLIAMS was stating this, WILLIAMS placed two bags containing an off-white substance in SA Bzduch's hand. At the same time, SA Bzduch provided $100.00 of pre-recorded U.S. currency to WILLIAMS. SA Bzduch placed the two bags in his pants pocket.

31. SA Bzduch engaged WILLIAMS in conversation and apologized for arriving to the location without first receiving any confirmation from JOHNSON. SA Bzduch asked WILLIAMS if there was a telephone number SA Bzduch could communicate with in order to

8

facilitate another purchase of drugs in the future. WILLIAMS provided the following telephone number to SA Bzduch: (802) 210-5223. SA Bzduch then exited the residence and walked towards the ATF SPV.

32. SA Bzduch entered the ATF SPV and then departed from the subject property. SA Bzduch traveled to a pre-determined meet location and secured the purchased evidence where it was turned over to RAC Person. RAC Person ultimately transported the purchased evidence to the Springfield Field Office located in Springfield, Massachusetts and secured the evidence there.

33. On June 26, 2020, SA Bzduch weighed and took photographs of the purchased evidence, the suspected crack cocaine. The suspected crack cocaine weighed approximately 0.5 grams (weight included packaging material). Due to safety and health concerns for ATF law enforcement personnel, the suspected crack cocaine was not field-tested. SA Bzduch then secured said evidence in the outer evidence vault area located within the ATF Springfield Field Office.

### Additional Surveillance of Subject Property

34. On July 7 and July 8, 2020, ATF SA McKee reviewed pole camera footage associated with the Subject Property. ATF SA McKee observed approximately 10 vehicles pull into the driveway of the residence and pull out of the driveway in short time increments, mostly under 5 minutes. Based on several other drug investigations, I know this activity to be consistent with the activity of customers purchasing drugs.

### Knowledge and Training

35. Based on my training and experience conducting drug investigations, I know that drug traffickers and distributors, commonly keep their drugs in their homes, on their property, in their

apartments or in hotel/motel rooms close to where they are staying. Distributors do this for several reasons, specifically to keep their drugs readily available for sale, to provide security for their drugs, and to help keep their activities clandestine, as their trade is illegal and they are constantly aware of law enforcement efforts to discover their activity.

36. Distributors commonly keep their drugs on their person(s) to prevent them from being stolen, and to avoid detection by law enforcement. It is common for distributors to keep the drugs concealed within their pockets, hidden compartments within their clothing, and within their undergarments.

37. Distributors commonly maintain on hand large amounts of cash in order to finance their on-going business. Distributors often have large amounts of currency on hand. Selling illegal drugs and purchasing illegal drugs is typically a cash-only business with few other legitimate means of purchase accepted.

38. Distributors commonly maintain addresses and telephone numbers in books or ledgers, which reflect the names, addresses, and telephone numbers of their drug associates.

39. It is common for distributors to conceal contraband, proceeds of drug sales, and records pertaining to their drug manufacture and drug transactions in secure locations within their residences, apartments, and hotel/motel rooms for ready access.

40. Further, based on my training and experience, I know that persons who participate in the distribution of controlled substances frequently use cellular telephones ("smartphones"), among other devices, to coordinate their unlawful activities and to maintain contact with suppliers and consumers of illegal drugs. In addition, I know that information stored on smartphones can constitute evidence of drug distribution. Among other things, the evidence may contain the telephone numbers assigned to the communication devices, the existence or content of messages

received by or sent from the devices, identification numbers and other information contained in their electronic memories, and the records of telephone numbers to which calls were placed and from which calls were received. Further, drug distributors often use their smartphones to take photographs of controlled substances, other members of their organizations, assets obtained from profits of drug sales, locations associated with their illegal activity, and other useful evidence. Finally, data contained in a smartphone or other electronic device may reveal the physical location of the device at various times. For example, the latitude and longitude of the camera at the time it takes a photograph will be contained in the metadata associated with the picture. In addition, if a device has Global Positioning System (GPS) capabilities, additional information regarding locations of the device, while it follows GPS directions, may be recovered from the device. In addition, drug distributors use these devices to communicate about drug sales through text messaging and social media sites such as Facebook, Twitter, Instagram and others.

41. Distributors usually keep paraphernalia, including scales, cutting agents, packaging materials, and instruments for consumption at the locations where those activities take place.

42. Distributors who have amassed proceeds from the sales of drugs will often attempt to legitimize these profits. In this process, drug distributors often utilize, among other things: banks and their attendants, ATM machines, financial services, securities, cashier's checks, money drafts, real estate, shell corporations, and business funds. Records evidencing such services and transactions are frequently maintained where the distributors have ready access to them.

43. Distributors often speak with others, in person and over the telephone, including their smartphones, regarding the acquisition and delivery or distribution of drugs.

44. Drug distributors use motor vehicles as a tool to conduct their businesses. Drug distributors use their vehicles, as well as vehicles that belong to others, to both transport and

11

store drugs. Drug distributors will oftentimes store such things as drugs, cash, drug records, customer lists, and paraphernalia within their vehicles.

45. Distributors usually keep paraphernalia including scales, cutting agents, packaging materials and instruments for consumption at the locations where those activities take place, including within their residences, vehicles, and other real property.

46. Distributors frequently take or cause to be taken, photographs of themselves, their associates, their property, and their drugs and/or money. Distributors usually maintain these photographs in their residences, vehicle, and other real property and/or on their electronic devices (including cell phones) and social media accounts such as Facebook, Twitter, Snapchat, etc.

47. Distributors often keep firearms including handguns, ammunition, and other weapons in their residences, vehicles, in other real property, and on their persons to safeguard supplies of drugs and fruits of dealing and using controlled substances.

## Conclusion

48. I respectfully submit that there is probable cause to believe that this affidavit supports probable cause for a search warrant authorizing a search of the Subject Property described in Attachment A to seek the items described in Attachment B.

Dated at Burlington, in the State of Vermont, this 16th day of July, 2020.

_____
Eric M. Brimo
Special Agent
Bureau of Alcohol Tobacco Firearm and Explosives

Sworn to and subscribed before me this 16th day of July, 2020.

_____
HON. JOHN M. CONROY
United States Magistrate Judge
United States District Court, District of Vermont

13